**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHEASTERN DIVISION**

STEVE BOUTON, et al.,                    )
                                         )
            Plaintiffs,                  )
                                         )
      v.                                 )          Case No. 2:22-CV-00010-SPM
                                         )
STATE OF MISSOURI, et al.,               )
                                         )
            Defendants.                  )

**MEMORANDUM AND ORDER**

This matter is before the Court on three motions: the Motion to Dismiss filed by Defendants

Missouri Department of Corrections, Anne Precythe, Chantay Godert, and Alan Earls

(collectively, the "MDOC Defendants") (Doc. 45); the Motion to Strike the MDOC Defendants'

Motion to Dismiss filed by Plaintiffs (Doc. 50); and the Motion to Join MDOC Defendants'

Motion to Dismiss filed by Defendants Dan Wiley and Keesila Ford (Doc. 56). The motions have

been fully briefed. The parties have consented to the jurisdiction of the undersigned United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 63). For the following reasons, the motion

to strike will be denied, the motion to dismiss filed by the MDOC Defendants will be granted in

part and denied in part, and the motion to dismiss filed by Wiley and Ford will be denied.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

On January 6, 2022, Plaintiffs Steve Bouton and Kimberly Barton filed a Petition for

Damages in the Circuit Court of Pike County, State of Missouri, alleging several claims under

state and federal law against eight defendants. (Doc. 1-2). On February 25, 2022, the case was

removed to this Court based on federal question jurisdiction. Plaintiffs filed a motion to remand,

and the motion was denied on June 1, 2022. (Doc. 36). On June 15, 2022, Plaintiffs filed an

Amended Complaint. (Doc. 38).

In the Amended Complaint, Plaintiffs bring claims against nine defendants: the State of Missouri, acting through the Missouri Department of Corrections ("MDOC"); Anne Precythe (the Director of MDOC); Alan Earls (the Deputy Director of MDOC); Chantay Godert (the warden of Northeast Correctional Center); Dan Wiley (a correctional officer at Northeast Correctional Center); Keesila Ford (another correctional officer at Northeast Correctional Center); Corizon, LLC (a healthcare provider that provides healthcare services at Northeast Correctional Center); Cherilyn DeSouza, M.D. (a physician and employee of Corizon); and Mary Summerville (a mental health provider and employee of Corizon). Plaintiffs allege the following. On July 9, 2019, Plaintiffs' son, Austin Bouton (the "decedent") died while in the custody of MDOC at the Northeast Correctional Center ("NECC"). Am. Compl. ¶ 1. Defendants knew, prior to that date, that the decedent suffered from mental illness, auditory hallucinations, visual hallucinations, and suicidal thoughts and had attempted suicide and self-injurious behavior in the past. *Id.* ¶¶ 4-6. Defendants knew that on October 29, 2018, the decedent had attempted suicide that required his hospitalization; that on November 12, 2018, the decedent had been put on suicide watch due to his suicidal statements and behavior; that on December 13, 2018, a search of the decedent's cell revealed a hanging device under his bed; that on April 17, 2019, a suicide note was found in the decedent's cell that indicated his intention and plan to take his own life; that on May 22, 2019, the decedent had indicated that he was concerned that if left alone in his cell he would hurt himself and would attempt suicide; that on June 10, 2019, that the decedent had indicated that he had attempted to commit suicide more times than had been reported; and that on July 5, 2019, the decedent indicated that his depression and thoughts of suicide had worsened and he was considering attempting suicide. *Id.* ¶¶ 6-12. On July 5, 2019, Plaintiff was seen by mental health provider Mary Summerville, at which time he reported that he was having auditory hallucinations;

– 2 –

that his depression was "significantly worse"; that his thoughts of self-harm had worsened; that he was experiencing suicidal thoughts; and that he did not identify any positive traits about himself. *Id.* ¶ 13. These findings were reported to Defendant Cherilyn DeSouza, M.D., and to the Correctional Staff of the MDOC. *Id.* ¶ 14. Despite this, a suicide watch was not initiated. *Id.* ¶ 15.

MDOC policies required that inmates be monitored at least every sixty minutes. *Id.* ¶¶ 155, 166, 177. However, Defendants Godert, Ford, and Wiley did not monitor the decedent. *Id.* ¶¶ 156(a), 167(a), 178(a). MDOC policies required that objects that could be used by inmates to attempt suicide be removed from holding cells. *Id.* ¶¶ 154, 165, 176. Defendants Godert, Ford, and Wiley knew that on July 9, 2019, and before, the decedent had fashioned a noose out of his bedsheets and knew that could be used to attempt suicide, yet they failed to remove either the noose or the bunkbed from the cell. *Id.* ¶¶ 156(b)-(c), 167(b)-(c), 178(b)-(c). 156, 165, 167, 178. On July 9, 2019, the decedent died by hanging in his cell. *Id.* ¶ 20.

Plaintiffs allege a total of thirteen counts in their Amended Complaint. The first three counts are alleged against Corizon and its employees and are not relevant to the instant motions. The other claims are as follows. In Counts IV through VI, Plaintiffs allege that Defendants Godert, Ford, and Wiley, respectively, in their individual capacities, failed to provide adequate medical care to the decedent, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. In Counts VII through IX, Plaintiffs allege claims against Defendants Precythe, Godert, and Earls, respectively, in their individual capacities, alleging that the policies, procedures, protocols, customs, practices, and training they developed at the facility violated the Eighth and Fourteenth Amendments and 42 U.S.C. § 1983. In Counts X through XII, Plaintiffs allege wrongful death (negligence) claims against Defendants Godert, Ford, and Wiley, respectively, in their individual capacities. Finally, in Count XIII, Plaintiff alleges a count of respondeat superior against Defendant MDOC.

On July 15, 2022, the MDOC Defendants (MDOC, Precythe, Earls, and Godert) filed a motion to dismiss, making six arguments: (1) Plaintiffs lack standing to bring their wrongful death claim against Defendant Godert because a state court has already granted the decedent's sister the exclusive right to bring such claims; (2) Plaintiffs are not entitled to sue under § 1983 on their own behalf for alleged violations of the decedents' rights; (3) Defendant Godert is entitled to official immunity from the wrongful death claim because it is based on the performance of discretionary acts; (4) Plaintiffs fail to state a claim against Defendant Godert for wrongful death because, as alleged, the suicide was an independent intervening act that is not actionable under the Missouri wrongful death statute; (5) MDOC is protected by the doctrines of sovereign immunity and Eleventh Amendment immunity, and such immunity cannot be circumvented through the doctrine of respondeat superior; and (6) Plaintiffs' Section 1983 claims premise liability on the policymaking activities of Defendants in their official capacities, and state officials cannot be sued in that way.

On August 2, 2022, Plaintiffs filed a motion to strike the MDOC Defendants' Motion to Dismiss on the ground that it was not timely filed. On August 3, 2022, Plaintiffs also filed a substantive response to the motion to dismiss.

On August 17, 2022, Defendants Dan Wiley and Keesila Ford filed a Motion to Join the MDOC Defendants' Motion to Dismiss, asserting that the first through fourth arguments advanced by the MDOC Defendants are also applicable to Defendants Wiley and Ford. Plaintiffs filed a response in opposition to that motion. Defendants then filed reply briefs in support of their motions.

## II.   PLAINTIFFS' MOTION TO STRIKE THE MDOC DEFENDANTS' MOTION TO DISMISS

Plaintiffs move to strike the Motion to Dismiss filed by the MDOC Defendants pursuant

to Rule 12(f), which permits the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Plaintiffs argue that the Motion to Dismiss should be stricken because it was untimely. They note that the First Amended Complaint was filed on June 15, 2022, and thus the MDOC Defendants had twenty-one days (until July 6, 2022) to file a responsive pleading under Rule 12(a)(1)(A). The MDOC Defendants' motion to dismiss was not filed until July 15, 2022.

In their response, the MDOC Defendants argue that a motion to strike is not an appropriate response to a motion to dismiss, because Rule 12(f) only authorizes the striking of material contained in a "pleading," and a motion to dismiss is not a pleading under Rule 7(a). *See Danzig v. LoanMe*, No. 4:20-cv-00389-SEP, 2021 WL 105614, at *6 (E.D. Mo. Jan. 12, 2021). They also ask that the Court accept the filing out of time pursuant to Rule 6(b)(1)(B). They state that based on discussions of the parties when they were drafting the Joint Scheduling Plan, they believed that they had thirty days to respond to the Amended Complaint. They point out that the other defendants who faced the same deadline apparently shared that belief, because they filed their Answer on July 15 as well. The MDOC Defendants also argue that the delay did not prejudice Plaintiffs, because substantially similar arguments were made in the state court motion and because later-served Defendants Wiley and Ford have raised most of the same bases for dismissal in a timely-filed motion to dismiss. Plaintiffs did not file a reply in support of their motion to strike.

The Court agrees with Defendants that a motion to strike under Rule 12(f) is not appropriately directed toward a motion to dismiss, because a motion to dismiss is not a "pleading." *See Danzig*, 2021 WL 105614, at *6 (discussing this issue and collecting cases). Thus, the Court will deny Plaintiffs' motion to strike. The fact remains, however, that the motion does appear to have been untimely filed. The Court construes the MDOC Defendants' response as a motion for leave to file out of time under Rule 6(b)(1)(B). For the reasons stated in the MDOC Defendants'

response, the Court finds excusable neglect and will permit the filing of that motion out of time.

### III.   DEFENDANTS' MOTIONS TO DISMISS

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss an action based on a lack of subject matter jurisdiction. The party asserting federal subject matter jurisdiction has the burden of establishing that subject matter jurisdiction exists. *Great Rivers Habitat All. v. Fed. Emergency Mgmt. Agency*, 615 F.3d 985, 988 (8th Cir. 2010). A court considering a motion under Rule 12(b)(1) must determine whether the motion makes a "facial attack" or "factual attack" on jurisdiction. Analysis of a "facial attack" is restricted "to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). However, if the motion brings a "factual attack," the court may consider matters outside the pleadings, and the non-movant does not have the benefit of the favorable standard afforded by 12(b)(6). *Id.*

For a claim to survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim satisfies the plausibility standard "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint "does not need detailed factual allegations" to survive a motion to dismiss, but it must contain factual allegations that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. When ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept as true all of the factual allegations in the complaint, but it need not accept the legal conclusions. *Iqbal*, 556 U.S. at 678. The Court must make "all reasonable inferences in favor of the nonmoving party."

*Usenko v. MEMC LLC*, 926 F.3d 468, 472 (8th Cir. 2019). Additionally, "Where the allegations show on the face of the complaint there is some insuperable bar to relief, dismissal under Rule 12(b)(6) is appropriate." *Benton v. Merrill Lynch & Co.*, 524 F.3d 866, 870 (8th Cir. 2008) (citing *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997)).

### A. Standing to Bring Wrongful Death Claims (Counts X, XI, and XII; Defendants Godert, Ford, and Wiley)

Defendants' first argument is that Plaintiffs' wrongful death claims against Defendants Godert, Ford, and Wiley should be dismissed for lack of subject matter jurisdiction because Plaintiffs lack standing to bring those claims. This argument is based on the entry of an order from the Circuit Court of Greene County, Missouri, Probate Division, Case No. 2031-PR-00352, appointing Alyssa Paige Bouton as the personal representative of the Estate of Austin Blake Bouton "who shall have the exclusive right to pursue any and all wrongful death, and/or other legal claims on behalf of the estate and its beneficiaries." MDOC Defs.' Ex. A, Doc. 45-2. Defendants argue that because a state court has granted Alyssa Bouton the exclusive right to pursue wrongful death claims, Plaintiffs cannot establish standing to bring these claims. In their response, Plaintiffs argue under Missouri law, they—as the natural parents of Austin Bouton—are the only individuals permitted to bring a wrongful death claim, and that neither an estate nor its personal representative has the right to bring a wrongful death claim. Because Defendants have brought in evidence outside the pleadings, the Court considers this challenge to be a factual attack on the Court's jurisdiction.

Upon consideration of the parties' arguments and the relevant law, the Court finds that Plaintiffs do have standing to bring the wrongful death claims in this case. Missouri law is clear that the decedent's parents are authorized to bring a wrongful death action and that the estate of the decedent is not. Wrongful death actions in Missouri are governed by Mo. Rev. Stat. § 537.080, which states, in relevant part:

537.080. Action for wrongful death—who may sue—limitation

1. Whenever the death of a person results from any act, conduct, occurrence, transaction, or circumstance which, if death had not ensued, would have entitled such person to recover damages in respect thereof, the person or party who, or the corporation which, would have been liable if death had not ensued shall be liable in an action for damages, notwithstanding the death of the person injured, which damages may be sued for:

(1) **By the spouse or children or the surviving lineal descendants of any deceased children**, natural or adopted, legitimate or illegitimate, **or by the father or mother of the deceased, natural or adoptive**;

(2) If there be no persons in class (1) entitled to bring the action, then by the brother or sister of the deceased, or their descendants, who can establish his or her right to those damages set out in section 537.090 because of the death;

(3) If there be no persons in class (1) or (2) entitled to bring the action, then by a plaintiff ad litem. Such plaintiff ad litem shall be appointed by the court having jurisdiction over the action for damages provided in this section upon application of some person entitled to share in the proceeds of such action. Such plaintiff ad litem shall be some suitable person competent to prosecute such action and whose appointment is requested on behalf of those persons entitled to share in the proceeds of such action. Such court may, in its discretion, require that such plaintiff ad litem give bond for the faithful performance of his duties.

2. Only one action may be brought under this section against any one defendant for the death of any one person.

Mo. Rev. Stat. § 537.080 (emphasis added). Plaintiffs, as the natural parents of Austin Bouton (who had no spouse or children) are expressly described in class (1) as the parties "who may sue" for wrongful death. In contrast, the statute does not include an estate, the beneficiaries of an estate, or the personal representative of an estate as being among the parties "who may sue."

Case law provides further support for the conclusion that Plaintiffs, and not the estate or its representative, may sue for the decedent's wrongful death. The Eighth Circuit recently noted, "The Missouri Supreme Court has clarified: Neither the decedent's estate nor its personal representative is authorized to bring or entitled to the proceeds of a wrongful death action." *King*

*v. United States*, 3 F.4th 996, 1000 (8th Cir. 2021) (citing *Sullivan v. Carlisle*, 851 S.W.2d 510 (Mo. 1993)). In *Sullivan*, the Missouri Supreme Court held that a decedent's estate is not among those who may sue for, or share in the proceeds of, a wrongful death action, even in a situation where there no persons in class (1) or class (2) entitled to bring the action. *Sullivan*, 851 S.W.2d at 513-15. The court reasoned that the residual clause in Mo. Rev. Stat. § 537.080.1(3) did not apply to an estate, because class (3) beneficiaries are limited to person who may take under the laws of descent, *see* Mo. Rev. Sat. § 537.095, and "a deceased person's estate is not a taker under the laws of descent. Accordingly, the estate of decedent can neither share in the proceeds of this action nor request the appointment of a guardian ad litem to prosecute it." *Sullivan*, 851 S.W.2d at 513. The court also noted that Missouri courts "have consistently denied a cause of action for wrongful death to the decedent's estate, even when there is no surviving heir." *Id.* The court further rejected the argument that under the probate code, the wrongful death claim had vested in the decedent's personal representative, stating, "The probate code merely authorizes the personal representative to commence and prosecute those 'actions which may be maintained.' § 473.270. The source of the personal representative's authority to maintain a particular action must be found in another substantive provision of law. The wrongful death statute is not such a source." *Id.* at 515.

Here, as in *Sullivan*, even though there is a personal representative who may maintain actions on behalf of the estate of the deceased, the source of the personal representative's authority to maintain a particular action must be found in a substantive provision of law. Here, as in *Sullivan*, the wrongful death statute does not provide that authority. Defendants have not identified any substantive provision of law that would permit an estate, or its personal representative, to bring a wrongful death claim. The probate court order giving Alyssa Bouton the exclusive right to pursue wrongful death claims on behalf of Austin Bouton's estate did not create a substantive right to

bring claims that are clearly not permitted under Missouri law.

Defendants' reliance on *Davis v. Wilson*, 804 S.W.2d 392 (Mo. Ct. App. 1991), is misplaced. In *Davis*, the court considered the issue of whether a claimant who had not been properly notified of a prior wrongful death settlement could bring a subsequent wrongful death action under Mo. Rev. Stat. § 537.080, and the court held that the second action was not permitted. *Id.* at 394-96. Here, there is nothing in the record to indicate that any wrongful death proceeding was initiated before this one, so *Davis* is not relevant here.

For all of the above reasons, the Court finds that Plaintiffs have standing to pursue the wrongful death claims, and the Court will deny Defendants' motions to dismiss Counts X, XI, and XII based on standing.

> B.  *Plaintiffs' Entitlement to Sue Under 42 U.S.C. § 1983 on Their Own Behalf (Counts IV, V, VI, VII, VIII, and IX; Defendants Godert, Ford, Wiley, Precythe, Godert, and Earls)*

Defendants' next argument is that Plaintiffs lack standing to bring their § 1983 claims. They make two somewhat distinct arguments: (1) that Plaintiffs lack standing to bring § 1983 claims on behalf of their son in a representative capacity, because the person with the exclusive right to bring legal claims on behalf of the estate is the decedent's sister, Alyssa Paige Bouton; and (2) that Plaintiffs have not even brought such representative claims in this case, but have instead sued under § 1983 *on their own behalf* for alleged violations of their child's rights, which is impermissible under Eighth Circuit law. Neither argument is persuasive.

The Eighth Circuit has held that the parties who have a right to sue under Missouri's wrongful death statute have standing to bring a § 1983 action based on a violation of the decedent's rights. *Andrews v. Neer*, 253 F.3d 1052, 1064 (8th Cir. 2001). In *Andrews*, the plaintiff's father died while in custody, the plaintiff brought a § 1983 action based on her father's death, and the

defendants challenged her standing to do so. The Eighth Circuit held that "the Missouri wrongful death statute applies and provides [the plaintiff] standing to pursue a § 1983 action on behalf of [her father]." *Id.* at 1057. As discussed at length above, Plaintiffs, not Alyssa Paige Bouton, are the parties who have standing under the Missouri wrongful death statute. Thus, they have standing to pursue a § 1983 action on behalf of their son.

Although it is clear that Plaintiffs have standing to bring the § 1983 action on behalf of their son, the types of damages they may recover are limited. In *Andrews*, after holding that the decedent's daughter had standing to sue, the Eighth Circuit considered whether the plaintiff could recover damages for *her own* injuries—in addition to damages for injuries suffered by her father— as authorized by the Missouri wrongful death statute. After considering a circuit split on the issue, the Eighth Circuit adopted the narrow approach taken by the Tenth Circuit: the plaintiff in a § 1983 action *may* recover "compensatory damages such as medical and burial expenses, pain and suffering before death, loss of earnings based on the probable duration of the victim's life, the victim's loss of consortium, and other damages recognized in such common-law tort actions" but *may not* recover damages that the "decedent could not have recovered had he lived to sue for himself," such as "loss of companionship and grief," even if those damages might be available in a wrongful death action. *Id.* at 1063-64 (citing *Berry v. City of Muskogee*, 900 F.2d 1489, 1506 (10th Cir. 1990)). The Eighth Circuit stated that "by allowing the measure of damages in [the plaintiff's] suit to be entirely defined by the language of the Missouri wrongful death statute, we would impermissibly broaden the types of injuries for which Congress intended recovery to be available under § 1983's authorization of liability 'to the party injured.'" *Id.* at 1064 (quoting § 1983). The Eighth Circuit noted that in the case before it, the plaintiff had not brought a separate claim for injury to her own constitutional rights, nor had she pursued a state-law wrongful death claim, and it found that she could not "shoehorn recovery available to her under such separate

claims into the recovery she may receive under § 1983 for her father's injuries." *Id.*

District courts within the Eighth Circuit have applied *Andrews* in finding that plaintiffs may not recover their own damages in a § 1983 action based on wrongful death, but may recover damages that would have been available to the decedent. *See also Davis v. Buchanan County. Missouri,* No. 5:17-CV-06058-NKL, 2019 WL 7116363, at *7 (W.D. Mo. Dec. 23, 2019) (relying on *Andrews* and holding that the parents of a deceased child did have standing to bring their son's § 1983 claims in a representative capacity under section 1983 and the Missouri wrongful death statute, but dismissing the § 1983 claims each plaintiff brought on his or her own behalf); *Teague v. St. Charles Cnty.*, 708 F. Supp. 2d 935, 939 (E.D. Mo. 2010) (stating, "The damages in a § 1983 wrongful death claim are limited to those that would have been available to the decedent for the violation of his constitutional rights" and noting that "appropriate damages include compensatory damages such as medical and burial expenses, pain and suffering before death, loss of earnings based on the probable duration of the decedent's life, the decedent's loss of consortium") (citing *Andrews*, 253 F.3d at 1063.

Based on the above, to the extent that Plaintiffs seek to obtain damages for their *own* injuries, beyond the damages that the decedent could have recovered had he lived to sue for himself, such damages are unavailable under *Andrews*. However, the Court rejects Defendants' suggestion that Plaintiffs have sought only these impermissible damages and have not actually asserted any § 1983 claims on behalf of their son. Although Plaintiffs do not expressly state in the Amended Complaint that they are bringing the 1983 claims on behalf of their son, most of the damages addressed in the Amended Complaint—including damages for the decedent's pain and suffering, funeral expenses, and lost future earnings—are exactly the type of damages the Eighth Circuit in *Andrews* found properly recoverable in a § 1983 wrongful death action. Moreover, Defendants do not cite any authority requiring the plaintiffs in a § 1983 wrongful death action to

expressly plead that they bring the action on behalf of the decedent.

For all of the above reasons, the Court finds that Plaintiffs have standing to pursue the § 1983 claims, subject to the limitations on available damages set forth above, and the Court will deny Defendants' motions to dismiss Counts IV, V, VI, VII, VIII, and IX based on standing.

### C.  Official Immunity (Counts X, XI, and XII; Defendants Godert, Ford, and Wiley)

Defendants' third argument is that Defendants Godert, Ford, and Wiley are entitled to official immunity from the wrongful death claims against them because those claims are based on the performance of discretionary acts. Under Missouri law, the doctrine of official immunity "protects public officials sued in their individual capacities 'from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts.'" *State ex rel. Alsup v. Kanatzar*, 588 S.W.3d 187, 190 (Mo. 2019) (quoting *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. 2008)). "The official immunity doctrine, however, does not provide public employees immunity for torts committed when acting in a ministerial capacity." *Letterman v. Does*, 859 F.3d 1120, 1125 (8th Cir. 2017) (quoting *Southers*, 263 S.W.3d at 610). "Whether an act is discretionary or ministerial depends on the degree of reason and judgment required to perform the act." *Davis v. Lambert-St. Louis Int'l Airport*, 193 S.W.3d 760, 763 (Mo. 2006) (internal quotation marks omitted). "[A] ministerial or clerical duty is one in which a certain act is to be performed 'upon a given state of facts in a prescribed manner in obedience to the mandate of legal authority, and without regard to [the public official's] judgment or opinion concerning the propriety or impropriety of the act to be performed.'" *Kanatzar*, 588 S.W.3d at 191 (quoting *State ex rel. Forgrave v. Hill*, 272 Mo. 206, 198 S.W. 844, 846 (Mo. 1917)). On the other hand, an act is discretionary where "there is any room whatsoever for variation in when and how a particular task can be done." *Davis v. Buchanan Cnty., Missouri*, 11 F.4th 604, 629 (8th Cir.

2021) (quoting *State ex rel. Helms v. Rathert*, 624 S.W.3d 159, 163 (Mo. 2021)).

Taking as true the factual allegations in the Amended Complaint, the Court finds that Plaintiffs have adequately alleged that Defendants Godert, Wiley, and Ford were acting in a ministerial capacity rather than a discretionary capacity, at least as to some of the alleged violations. For example, Plaintiffs allege that MDOC's policies and procedures require that objects that could be used by inmates to attempt or commit suicide be removed from holding cells, that Austin Bouton fashioned a noose with which to commit suicide out of his jail-issued bed sheets, and that Defendants failed to remove the noose from his cell. The duty to remove a noose from an inmate's cell, when one is subject to a policy requiring the removal of objects from an inmate's cell that could be used to attempt suicide, does not involve the exercise of reason or judgment that characterizes discretionary acts; it is a ministerial act. The other alleged violations of duty—such as Defendants' alleged failure to monitor Austin Bouton despite a policy requiring that all inmates be monitored every 60 minutes and Defendants' alleged failure to take action in response to Austin Bouton's suicidal indicators—present closer questions, because it is not clear from the facts alleged what level of judgment, if any, the defendants were required to exercise in carrying out the duties at issue. A failure to monitor an inmate and/or take action in response to the required monitoring may, under some circumstances, be a ministerial duty. *See Letterman v. Does*, 859 F.3d 1120, 1126-27 (8th Cir. 2017) (finding ministerial a policy requiring officers to check on an inmate every fifteen minutes and report as a medical emergency any instance when they could not observe movement or obtain a verbal response or when it appeared that the inmate was not breathing).

It is certainly possible that Defendants might decide to renew their official immunity argument later in this litigation, when there are additional facts for the Court to consider. Based on the pleadings alone, however, Defendants are not entitled to official immunity on the wrongful death claims.

– 14 –

For all of the above reasons, the Court will deny Defendants' motions to dismiss Counts X, XI, and XII based on official immunity.

### D. Failure to State a Claim for Wrongful Death – Independent Intervening Act (Counts X, XI, and XII; Defendants Godert, Ford, and Wiley)

Defendants' fourth argument is that Plaintiffs have failed to state a claim for wrongful death against Defendants Godert, Ford, and Wiley because the decedent's suicide was an independent intervening act that breaks the causal connection between a prior negligent act and the death. "To show causation in any wrongful death case, a plaintiff must show that the negligence of the defendant 'directly cause[d]' or 'directly contribute[d] to cause' the patient's death." *Kivland v. Columbia Orthopaedic Grp., LLP*, 331 S.W.3d 299, 306 (Mo. 2011) (quoting *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 863 (Mo. 1993)). "Before a jury can decide causation, however, a plaintiff must offer evidence that the court determines would establish that the defendant's negligence was the proximate cause of the decedent's death." *Id.* at 309. "Proximate cause inquires into the scope of foreseeable risk created by the defendant's act or omission." *Tharp v. St. Luke's Surgicenter-Lee's Summit*, LLC, 587 S.W.3d 647, 657 (Mo. 2019) (quoting *Nail v. Husch Blackwell Sanders, LLP*, 436 S.W.3d 556, 563 (Mo. 2014)). An intervening act may preclude a finding of proximate cause where the intervening act is "a new and independent force which so interrupts the chain of events that it becomes the responsible, direct, proximate and immediate cause of the injury." *Thompson v. City of St. Joseph*, 597 S.W.3d 687, 692 (Mo. Ct. App. 2019) (internal quotation marks omitted). *See also Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 865 (Mo. 1993) ("If the facts involved an extended scenario involving multiple persons and events with potential intervening causes, then the requirement that the damages that result be the natural and probable consequence of defendant's conduct comes into play and may cut off liability."). "However, an 'intervening cause will not preclude liability where it is itself a

foreseeable and natural product of the original negligence." *Thompson v. City of St. Joseph*, 597 S.W.3d at 92 (internal quotation marks omitted)

In a case involving suicide, the Missouri Supreme Court has held that "[a] plaintiff can show that the defendant's negligence was the proximate cause of the decedent's suicide by presenting evidence that the decedent's suicide was the 'natural and probable consequence' of the injury he suffered at the hands of the defendant." *Kivland*, 331 S.W.3d at 309-10. Absent such evidence, "the suicide would be an intervening cause and the claim could not be submitted to the jury." *Id.*

The parties have not cited, and the Court has not found, any Missouri state cases addressing whether (or under what circumstances) the proximate cause requirement may be satisfied in a case involving a jail official's negligent failure to prevent an inmate's suicide. However, in several cases, judges in this district applying Missouri law in such circumstances have found the proximate cause requirement satisfied, rejecting arguments similar to those advanced by Defendants in this case.

In *Tanner v. City of Sullivan*, No. 4:11-CV-1361-NAB, 2013 WL 3287068 (E.D. Mo. June 28, 2013), a woman committed suicide in jail by hanging herself with the string from her hooded sweatshirt. *Id.* at *3. Her family members brought Missouri state wrongful death claims against jail officials, alleging that the defendants had failed to conduct a search to find the string, failed to remove the string, and failed to monitor the decedent adequately. *Id.* at *8. After a jury verdict in the plaintiffs' favor, the defendants moved for judgment as a matter of law, relying on *Kivland* for the proposition that in order to prove causation there must be evidence that the decedent suffered an injury at the hands of the defendants and that there must be medical expert testimony to establish a causal connection between some injury attributable to the defendants that caused the decedent to kill herself. *Id.* at *7-*8. The court rejected that argument, finding that *Kivland* did not require

expert testimony and that the evidence presented was sufficient to establish proximate cause:

> Plaintiffs presented sufficient evidence from which a jury could believe that, had the string been removed from Palmer's hooded sweatshirt, Palmer's death would have been prevented. Likewise, the Plaintiffs presented sufficient evidence from which a jury could believe that if Palmer had been properly monitored, her death would have been prevented. Proximate cause, was therefore established in this case.

*Id.* at *8.

Another judge reached a similar conclusion in *Harmon v. Second Judicial Circuit*, No. 2:21-CV-00026-SEP, 2022 WL 990671, at *13 (E.D. Mo. Mar. 31, 2022). In *Harmon*, a minor with a history of suicidal ideation and threats was taken into the protective custody of the Missouri Department of Social Services and housed at the Bruce Normile Juvenile Justice Center. *Id.* at *1.While he was there, a social worker provided medical treatment to him on several occasions. *Id.* at *2. Shortly before he was to be discharged, the minor saw the social worker for a consultation at which he reported that he was sleeping a lot so that he didn't "have to feel," and the social worker observed that he had a flat affect and refrained from making eye contact or displaying emotion. *Id.* The social worker did not inform any relevant staff or institutions of her observations. *Id*. The next day, the minor was found hanging by his neck from his bathroom door; he died a few days later. *Id.* The minor's mother brought a Missouri wrongful death claim against the social worker and her employer under Missouri law, and the defendants moved to dismiss the claim, arguing that the plaintiff had not alleged sufficient facts to support a finding that their actions proximately caused the minor's death, primarily because the minor was not in their physical custody. *Id.* at *13. Applying *Kivland* and *Tanner*, the court rejected that argument, finding that the complaint "does include allegations from which a jury may infer that [the social worker's] negligence proximately caused [the minor's] death" and that "[a] reasonable jury could infer from such allegations that [the minor's] suicide was a probable consequence of [the social worker's]

actions." *Id.*[1]

The facts alleged in this case are very similar to the facts in *Tanner* and *Harmon*. Plaintiffs allege that Defendants knew of facts showing that the decedent was at a high risk of suicide (including knowing about past suicide attempts and expressions of suicidal thoughts just a few days before his suicide) and knew that he had fashioned a noose with which to commit suicide out of his jail-issued bed sheets, yet they failed to monitor him and failed to remove the noose (or his bunkbed) from his cell despite an affirmative duty to do so. Shortly thereafter, in a highly foreseeable turn of events, the decedent hung himself. These facts are sufficient to suggest that the decedent's suicide was a natural and probable cause of Defendants' negligence, and thus that proximate cause is established.

Defendants' reliance on *Haynes v. Williams*, No. 1:21-CV-160-ACL, 2022 WL 2064613 (E.D. Mo. June 8, 2022), is unpersuasive. In *Haynes*, a minor committed suicide after being abused by her father. *Id.* at *1-*3. The minor's mother sued (among other defendants) the minor's grandmother, alleging that the grandmother had negligently failed to supervise the father's visits with the minor, thereby allowing the father's sexual abuse to occur and causing the minor to suffer mental health decline and eventually to commit suicide. *Id.* at *4. The court granted the grandmother's motion to dismiss based on lack of proximate cause, stating:

> The Court agrees with [the grandmother] that her alleged negligent conduct was too far removed from [the minor's] death. [The grandmother] may have created a condition for [the minor's] injury to occur in failing to adequately supervise [the father]. However, if a prior and remote cause does nothing more than give rise to an occasion by which an injury is made possible, and there intervenes between that cause and the injury a distinct and unrelated cause of injury, a negligence action does not lie, even though the 'but-for' test is satisfied.

---

[1] Defendants attempt to distinguish *Harmon* on the basis that "the social worker provided treatment to the child on multiple occasions and therefore directly contributed to the state of the child's mental health." (Doc. 62, at p. 9). But the child's suicidal ideation and depression pre-dated his treatment by the social worker, and there is nothing in *Harmon* to suggest that the social worker's treatment of the child worsened his condition.

> The Court finds that the allegations in the Complaint are insufficient to establish [the grandmother's] alleged negligent supervision of [the father] proximately caused [the minor's] death. [The grandmother's] alleged actions and inactions are too attenuated to [the minor's] death by suicide.

*Id.* at *6. *Haynes* is distinguishable from the instant case, because the level of removal between the negligence and the injury that was present in *Haynes* is simply not present here. In *Haynes*, the alleged negligent act and the suicide are separated by two intervening, independent occurrences—the father's sexual abuse and the minor's development of mental illness. Here, in contrast, the connection between the alleged inaction and the suicide is much more direct: the jailers failed to monitor (and remove dangerous items from the cell of) an inmate known to be at risk of suicide, and the inmate committed suicide. The suicide was not a "distinct and unrelated cause of injury" that intervened between the negligent act and the death; it was "a foreseeable and natural product of the original negligence." *Thompson*, 597 S.W.3d at 92. *Haynes* is further distinguishable because, unlike the facts alleged in this case, it did not involve an affirmative duty to protect against self-harm that may arise from a jailor/inmate relationship.[2]

Defendant's reliance on *Neurological Medicine, Inc. v. General American Life Insurance Company*, 921 S.W.2d 64, 67-68 (Mo. Ct. App. 1996), is also unpersuasive. In that case, the court stated, "[i]n Missouri, suicide is generally deemed to be an independent intervening act which breaks the causal connection between a prior negligent act and the death," but that a "submissible

---

[2] The Court notes that in at least one case pre-dating *Kivland*, a judge in this district rejected the argument that a jail suicide is an intervening and superseding cause that breaks the chain of causation absent a showing that the decedent was insane and the defendant caused the insanity; the court found that the Missouri cases articulating the general rule were distinguishable because they did not involve a jailor/inmate relationship that imposed a duty on the jailors to protect the inmate from harm. *See Coleman v. City of Pagedale*, No. 4:06CV01376 ERW, 2008 WL 341720, at *2-*3 (E.D. Mo. Feb. 5, 2008) (recognizing the jailer-detainee relationship as an "exceptional circumstance in which the duty to protect against a known possibility of self-inflicted harm transfers entirely to the jailer" and distinguishing *Neurological Medicine, infra,* and similar cases on that basis).

– 19 –

case may still be made if the evidence establishes that the defendant's allegedly negligent act caused the decedent to become insane in the sense that 1) the insanity prevented the decedent from understanding what he or she is doing or understanding its inevitable or proper consequences, or 2) the decedent's act of suicide is the result of an insane impulse which prevented reason from controlling his or her actions." *Id.* 67. But in *Kivland*, the Missouri Supreme Court rejected the approach used in *Neurological Medicine, Inc.*; it noted the problems with requiring the plaintiff to show that the decedent was "insane" and acting as a result of an "irresistible impulse," and has stated that "The better rule . . . is to focus on what Missouri cases actually require in wrongful death cases: whether the decedent's death was 'a direct result' of defendant's negligence." *Kivland*, 331 S.W.3d 306. Like the courts in *Tanner* and *Harmon*, this Court will rely on the rule as articulated by the Missouri Supreme Court in *Kivland* and the cases interpreting *Kivland*, and not the rule articulated in earlier cases.

For all of the above reasons, the Court will deny Defendants' motions to dismiss Counts X, XI, and XII based on failure to state a claim.

### E.   Sovereign Immunity and Eleventh Amendment Immunity (Count XIII; Defendant MDOC)

In Count XIII ( "Respondeat Superior"), Plaintiffs allege that in committing the acts alleged earlier in the Amended Complaint, the individually named defendants were acting as agents of MDOC, that MDOC is liable as principal for all torts committed by its agents, and that Defendant has waived sovereign immunity because it has a policy of insurance that provides insurance coverage for the actions of the individual defendants in this matter. MDOC argues that it is protected by the doctrines of Missouri sovereign immunity and Eleventh Amendment immunity. Respondent also argues that a government entity cannot be held liable under § 1983 based on the

theory of respondeat superior.[3]

To the extent that Count XIII is asserted under § 1983, the Court agrees with MDOC that it must be dismissed. It is well established that "the doctrine of respondeat superior does not apply to § 1983 cases." *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014). Additionally, as Defendants point out in another section of their brief, as a state agency, MDOC is not a "person" who can be sued for monetary damages under § 1983. *See Will v. Michigan Dep't. of State Police*, 491 U.S. 58, 66 (1989). This provides a second, independent reason for dismissing these claims. Thus, to extent that Count XIII is based on § 1983, it will be dismissed.

The Court next considers whether, to the extent that Count XIII is based on state law, MDOC is entitled to sovereign immunity. "Sovereign immunity is the privilege of the sovereign not to be sued without its consent." *Church v. Missouri*, 913 F.3d 736, 742 (8th Cir. 2019) (quoting *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011)). It is "a jurisdictional threshold matter." *Harmon Indus., Inc. v. Browner*, 191 F.3d 894, 903 (8th Cir. 1999). MDOC argues that it is entitled to sovereign immunity under both Missouri law and the Eleventh Amendment.

Under Missouri law, "For suits against public entities, sovereign immunity is the rule, not the exception." *Newsome v. Kansas City, Missouri Sch. Dist.*, 520 S.W.3d 769, 775 (Mo. 2017) "Under Mo. Rev. Stat. § 537.600, public entities enjoy sovereign immunity . . . unless immunity is waived, abrogated, or modified by statute." *Richardson v. City of St. Louis*, 293 S.W.3d 133, 136 (Mo. Ct. App. 2009). Missouri has waived its sovereign immunity in several specific circumstances, only one of which is relevant to this case: "When a public entity purchases liability

---

[3] Defendants also argue that these doctrines apply to all claims against MDOC employees acting in their official capacities. However, as Plaintiffs correctly point out, they have not brought any such claims; their claims are against the individual employees in their individual capacities.

insurance to cover torts, other than the negligent operation of motor vehicles by public employees and the dangerous condition of a public entity's property, § 537.610.1 provides that sovereign immunity is waived as to those other torts to the extent of and for the specific purposes covered by the insurance purchased." *Holesapple v. Missouri Highways & Transportation Comm'n*, 518 S.W.3d 836, 840 (Mo. Ct. App. 2017) (internal quotation marks omitted).

"Sovereign immunity is not an affirmative defense but is part of the plaintiff's *prima facie* case." *St. John's Clinic, Inc. v. Pulaski Cnty. Ambulance Dist.*, 422 S.W.3d 469, 471 (Mo. App. 2014) (internal quotation marks omitted). Therefore, "it is incumbent upon a plaintiff who seeks to state a claim for relief to specifically allege facts establishing that an exception applies." *Boever v. Special Sch. Dist. of St. Louis Cnty.*, 296 S.W.3d 487, 491 (Mo. Ct. App. 2009).

In Count XIII, Plaintiffs allege that MDOC "has a policy of insurance which provides insurance coverage for the actions of the individually named Defendants as described herein, and in relation to the provision of medical care to inmates, and thus, they have waived sovereign immunity." Am. Compl. ¶ 184. The Court finds this sufficient to allege that the state has waived its sovereign immunity as to the tort claims in this case pursuant to the insurance exception set forth above. MDOC's arguments to the contrary are unpersuasive.

First, MDOC argues that the existence of two other cases finding MDOC entitled to sovereign immunity "heavily implies that no such insurance policy exists." Mem. Supp. MDOC Defs.' Mot. to Dismiss, Doc. 45-1, at p. 10. But in deciding a motion to dismiss, this Court must accept as true the facts *as alleged in this case*, not rely on facts outside the pleadings from other cases.[4]  If MDOC wishes to produce evidence to dispute the allegation that this insurance policy

---

[4] The Court also notes that the cases MDOC cites did not even address the actual question of whether MDOC had insurance that would waive sovereign immunity; at most, they addressed whether the plaintiffs in those cases had pleaded the existence of such insurance. *McIlvoy v. Sharp*, 485 S.W.3d 367, 372 (Mo. Ct. App. 2016) (affirming dismissal where the "petition does not

exists, that is a matter for summary judgment. The cases cited by MDOC do not support its position.

Second, MDOC argues that Plaintiffs' allegation is insufficient because Plaintiffs have not identified a specific insurance plan or demonstrated that it would apply to their claims. But Defendants cite no authority to support the contention that Plaintiffs must identify a specific insurance policy in order to plead a waiver of sovereign immunity. In the cases relied on by MDOC, there were no factual allegations the defendant had purchased insurance at all. *See Filius v. Missouri Dep't of Corr.*, No. 4:21CV01483, 2022 WL 888138, at *7 (E.D. Mo. Mar. 25, 2022) (dismissing claims based on sovereign immunity where "Plaintiff does not allege the existence of any insurance policy, but instead submits that he should be allowed to proceed to discovery because evidence of an insurance policy could potentially be discovered"); *Brennan By & Through Brennan v. Curators of the Univ. of Missouri*, 942 S.W.2d 432, 435 (Mo. Ct. App. 1997) (affirming dismissal where the plaintiffs did not plead a waiver of sovereign immunity and did not plead facts alleging that the defendants had adopted an insurance plan that covered the claims at issue; rejecting the plaintiffs' argument that the burden of pleading and proving a waiver of sovereign immunity was on the defendants and not the plaintiffs).

The Court next addresses whether, even if MDOC has waived Missouri sovereign immunity as to the state claims against it, MDOC is protected from Plaintiffs' claims by the Eleventh Amendment. "The Eleventh Amendment protects States and their arms and instrumentalities from suit in federal court." *Webb v. City of Maplewood*, 889 F.3d 483, 485 (8th Cir. 2018). However, in *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, the Supreme Court

---

identify any exception to sovereign immunity that might be applicable to this case, nor does it set forth facts that would give rise to any recognized exception to sovereign immunity"); *Rauch v. Corizon Med.,* 607 S.W.3d 750, 752-53 (Mo. Ct. App. 2020) (noting that the motion court had dismissed claims against MDOC based on sovereign immunity but not addressing the issue itself).

held that a state's act of voluntarily agreeing to remove a lawsuit from state court to federal court waives the state's Eleventh Amendment immunity, at least as to state-law claims where the State has waived immunity from state-court proceedings. 535 U.S. 613, 617-20 (2002). *See also Kruger v. Nebraska*, 820 F.3d 295, 301 (8th Cir. 2016) (discussing *Lapides*). Here, although MDOC was not the party who removed the case to federal court, and although MDOC did not timely consent to the removal, MDOC opposed Plaintiffs' motion to remand the case to state court, arguing that if the motion to remand were granted, a later-served defendant would file a new notice of removal and that "MDOC Defendants would also consent." MDOC's Opp'n to Mot. to Remand, Doc. 19, at 2. This demonstrates MDOC's agreement to remove this case from state court to federal court. Additionally, the claims at issue are state-law claims for which the Court has held that the State has waived immunity from state-court proceedings, at least at this stage of the case, where the Court must take as true the allegations in the Amended Complaint. Thus, Defendant has waived its Eleventh Amendment immunity as to these claims.

For all of the above reasons, the Court will grant Defendants' motion to dismiss Count XIII to the extent that it is based on § 1983, but will deny Defendants' motion to dismiss Count XIII to the extent that it is based on state-law claims.

### F. Policy-Related Claims (Count IV and Counts VII through IX; Defendants Precythe, Godert, and Earls)

In Count VII through IX Plaintiffs allege "Policies, Procedures, Customs, Practices, and Training in Violation of the Eighth and Fourteenth Amendments to the United States Constitution—Medical Care" claims under § 1983 against three individual defendants in their individual capacities: Anne Precythe, Chantay Godert, and Alan Earls. Plaintiffs allege, *inter alia*, that these defendants were the "individuals in charge of developing, promulgating, and training officers on the facilities polices, procedure, protocols and customs and practices at Northeast

Correctional Facility," Am. Comp. ¶¶ 106, 123, 140, and that the policies and procedures developed by these defendants allowed and encouraged correctional officers to ignore the serious medical and mental health needs of inmates (including suicidal ideations and prevent inmates from receiving proper medical care), constituting deliberate indifference and cruel and unusual punishment. Plaintiffs seek monetary damages. In Count IV, Plaintiffs allege that Defendant Godert had actual knowledge that the decedent had suicidal ideation and needed medical care, yet refused to provide it, and that her action constituted deliberate indifference to the decedent's medical needs.

Defendants argue that these § 1983 claims should be dismissed for failure to state a claim because they are, in effect, claims against state officials in their official capacities that are not permissible under § 1983. Defendants argue that because these claims are based upon the administration of MDOC and Northeast Correctional Center, and concern state policies and procedures, the state is the real party in interest, and therefore the claims should be treated as ones against the state and dismissed.[5] Defendants do not expressly state that their argument is based on sovereign immunity, but the cases on which they rely generally address sovereign immunity issues. Plaintiffs respond that Defendants' argument is without merit because Plaintiffs have expressly sued these defendants in their individual capacities.

To the extent that Plaintiffs are attempting to bring claims in Counts VII through IV against the defendants for money damages *in their official capacities*, Defendants are correct that such claims are not permitted. "Neither the State nor its officials acting in their official capacities are 'persons' capable of being sued under 42 U.S.C. § 1983." *Mayorga v. Missouri*, 442 F.3d 1128, 1130-31 n.2 (8th Cir. 2006) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)).

---

[5] It is not clear to the Court why Defendants include Count IV in the counts addressed by this argument, as Count IV does not appear to concern state policies or procedures.

However, as Plaintiffs point out, Plaintiffs expressly state in the Amended Complaint that they are suing these defendants *in their individual capacities.* It is well established that "state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983. The Eleventh Amendment does not bar such suits, nor are state officers absolutely immune from personal liability under § 1983 solely by virtue of the 'official' nature of their acts." *Hafer v. Melo*, 502 U.S. 21, 31 (1991).

To the extent that Defendants argue that the Court should construe these individual-capacity claims as official-capacity claims because they concern state policies, the Court disagrees. Defendants cite several cases addressing Eleventh Amendment immunity and the importance of respecting state sovereignty where an action is brought against a state, but (as discussed below), none of those cases actually address facts analogous to those presented here. Defendants do not cite any cases in which a court has construed an individual-capacity claim for money damages against a state official to be an official-capacity claim or a claim against the state. Defendants also do not cite any cases holding that a plaintiff may not state a claim by bringing an action for money damages against a state official in his or her individual capacity based on the official's involvement in developing unconstitutional policies or procedures. The Court's own research suggests that courts that have considered arguments similar to Defendants' have rejected those arguments and have found that a plaintiff may bring a § 1983 claim against a state official in his individual capacity based on the official's adoption of unconstitutional policies and procedures.

*Broder v. Correctional Medical Services., Inc.*, No. 03-75106, 2008 WL 704229, at *1 (E.D. Mich. Mar. 14, 2008), is on point. In *Broder*, a prisoner in the custody of the Michigan Department of Corrections filed claims under § 1983 against two officials in their individual capacities, based on their role in devising and implementing medical policies. *Id.* at *1. In a summary judgment motion, the defendants argued that these claims were, in effect, official-

capacity claims that were not permitted under the Eleventh Amendment:

> Defendants contend that [they] cannot be held liable under 42 U.S.C. § 1983 for a constitutional violation attributed to an official policy. At the outset, Defendants note that Eleventh Amendment immunity precludes an official capacity claim for monetary damages against state official on a custom and policy theory. They characterize Plaintiff's claim is an attempt to circumvent that immunity by suing Defendants for monetary damages in their individual capacities. They assert that a custom or policy can only be adopted by an official in his official capacity.

*Id.* at *2. The district court squarely rejected Defendants' argument and permitted the § 1983 claims against the state officials in their individual capacities to go forward:

> [T]he Court rejects Defendants' objection. State officials can be found liable in their individual capacities for implementing unconstitutional state policies and practices. In *Hafer v. Melo*, 52 U.S. 21, 26 (1991), the Supreme Court held that a state official may be sued personally for damages under § 1983 for actions taken in an official capacity. "The phrase 'acting in their official capacities' is best understood as a reference to the capacity in which the officer is sued, not the capacity in which the officer inflicts the alleged injury." *Id.*
>
> The Eleventh Amendment does not erect a barrier against suits to impose "individual and personal liability" on state officials under § 1983. *Id.*, at 31. Although "imposing personal liability on state officers may hamper their performance of public duties," the Court recognized that those concerns were better addressed in the "framework of [ ] personal immunity jurisprudence." *Id*. In short, case law does not support Defendants' argument. "The Eleventh Amendment does not bar such suits, nor are state officers absolutely immune from personal liability under § 1983 solely by virtue of the "official" nature of their acts." *Id.*

*Id.* at *3.

Another court reached a similar conclusion in *Roe v. Elyea*, No. 06-3034, 2009 WL 10681182, at *2 (C.D. Ill. Feb. 18, 2009), *aff'd*, 631 F.3d 843 (7th Cir. 2011). In *Roe*, the plaintiff sued the former medical director of the Illinois Department of Corrections under § 1983 for money damages, both individually and in his official capacity, based on his creation and implementation of a treatment policy that allegedly amounted to deliberate indifference to the plaintiff's serious medical needs. *Id.* at *1. The doctor argued that all of the claims against him were barred by Eleventh Amendment immunity. *Id.* at *2. The court rejected that argument, stating:

> Dr. Elyea argues that money damages against him are barred by Eleventh
> Amendment sovereign immunity because this case was against him in his official
> capacity only. It is true that money damages against Dr. Elyea in his official
> capacity as (former) Medical Director are barred. *See Wynn v. Southward*, 251 F.3d
> 588, 591 (7th Cir. 2001). But this case was also against Dr. Elyea in
> his *individual* capacity. Defendant Elyea personally devised and implemented
> the IDOC's testing and treatment policy for inmates with Hepatitis C. Since he was
> personally responsible for devising and implementing that policy, he is liable
> individually if that policy amounted to deliberate indifference to the plaintiffs'
> serious medical needs. *Armstrong v. Squadrito*, 152 F.3d 564, 581 (7th Cir. 1998)
> (state actor can be liable individually if he or she "personally devised a deliberately
> indifferent policy that caused a constitutional injury").

*Id.* at *2. On appeal, the Seventh Circuit affirmed the district court's denial of summary judgment

on the individual-capacity deliberate indifference claim against the doctor, finding that the plaintiff

"presented sufficient evidence from which a jury could conclude that Dr. Elyea acted with a

sufficiently culpable state of mind in setting the IDOC policy that resulted in a denial of the

treatment recommended under the Guidelines to Mr. Roe."   *Roe v. Elyea*, 631 F.3d 843, 862 (7th

Cir. 2011).

Statements from other courts, though not squarely addressing the issues presented here,

further support the position that a plaintiff may bring an individual-capacity suit based on an

official's decision to institute an unconstitutional policy. *See Miller v. Kozel*, No. CIV.A. 10 C

5381, 2011 WL 5024554, at *15 (N.D. Ill. Oct. 19, 2011) (noting that "[a] state official may be

liable in an individual capacity if the official instituted an unconstitutional policy that harmed the

plaintiff, even if the official never knew the plaintiff"), *aff'd sub nom. Miller v. Harbaugh*, 698

F.3d 956 (7th Cir. 2012); *Bingham v. Pancake*, No. 5:09-CV-00095, 2011 WL 1134258, at *3

(W.D. Ky. Mar. 25, 2011) (noting that "individual capacity claims may . . . be founded upon

implementing unconstitutional state policies and practices"). *Cf. Ouzts v. Cummins*, 825 F.2d 1276,

1277 (8th Cir. 1987) (noting, in a case against officials of the Department of Correction for the

State of Arkansas, that a prison warden "might be liable if the warden had made policy decisions

resulting in the unconstitutional conditions" and that the plaintiff "could have stated a claim against [the warden] if he had pled that there was a prison policy of, or deliberate indifference to, correction officers beating prisoners").

After careful consideration, the Court agrees with the reasoning of the courts in *Broder* and *Roe* and finds that Plaintiff may assert § 1983 claims against these defendants in their individual capacities, based on their roles in creating and implementing policies, procedures, and training programs. The cases cited by Defendants, which address general Eleventh Amendment and sovereign immunity principles in situations very different from those here, do not alter the Court's conclusion. *See Ex Parte Young*, 209 U.S. 123 (1908) (holding that the Eleventh Amendment does not bar a suit to enjoin a state official from enforcing unconstitutional state laws); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997) (holding that the exception in *Ex Parte Young* should not be universally applied to every federal court action in which injunctive relief is sought against an officer named in his individual capacity, but rather should be applied on a case-by-case basis after a careful balancing and accommodation of state interests; finding the *Young* exception inapplicable in the case before it because of the extensive impact the injunction sought would have had on Idaho's sovereign interest in its lands and waters); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984) (holding that the Eleventh Amendment bars a suit against a state official based on *state law* where "the relief sought and ordered has an impact directly on the State itself"); *State of Hawaii v. Gordon*, 373 U.S. 57, 58 (1963) (dismissing a claim brought against a U.S. official seeking an order for the official to "withdraw [his] advice to the federal agencies, determine whether a certain 203 acres of land in Hawaii acquired by the United States through condemnation was land or properties 'needed by the United States' and, if not needed, to convey this land to Hawaii"; noting that "the general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter" and that

"the order requested would require the Director's official affirmative action, affect the public administration of government agencies and cause as well the disposition of property admittedly belonging to the United States"). Defendants cite isolated statements from these cases, without context, but they do not explain how the *holdings* of any of these cases support dismissal of the claims at issue here. The Court finds that they do not. None of these cases addressed the circumstances at issue here: a federal claim for money damages asserted against state officials in their individual capacities.

For all of the above reasons, the Court will deny Defendants' motion to dismiss Counts IV and VII through IX based on the argument that these individual-capacity claims should be construed as official-capacity claims.

## IV.   CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the Plaintiffs' Motion to Strike the MDOC Defendants' Motion to Dismiss (Doc. 50) is **DENIED**.

**IT IS FURTHER ORDERED** that the Motion to Dismiss filed by Defendants Missouri Department of Corrections, Anne Precythe, Chantay Godert (Doc. 45) is **GRANTED IN PART and DENIED IN PART**, as follows. With respect to any claims in Count XIII based on § 1983, the motion is **GRANTED**. In all other respects, the motion is **DENIED.**

**IT IS FURTHER ORDERED** that the Motion to Join MDOC Defendants' Motion to Dismiss filed by Defendants Dan Wiley and Keesila Ford (Doc. 56), which the Court construes as a Motion to Dismiss, is **DENIED**.

_____

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 25th day of January, 2023.

– 30 –